## UNITED STATES DISTRICT COURT
## DISTRICT COURT

ELIZABETH JAEGER,                                        CIVIL NO. 05-1676 RHK/AJB

                    PLAINTIFF,

V.                                                       REPORT AND RECOMMENDATION OF PARTIES'
                                                         CROSS MOTIONS FOR SUMMARY JUDGMENT

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

                    DEFENDANT.
_____

Phillip R. Reitan, Esq., for the plaintiff Elizabeth Jaeger.

Lonnie F. Byran, Assistant United States Attorney for the Commissioner.
_____

## I.    INTRODUCTION

Plaintiff Elizabeth Jaeger disputes the unfavorable decision of the Commissioner of the Social

Security Agency (Commissioner) denying her claim for a period of disability, Disability Insurance

Benefits (DIB) and Supplemental Security Income Benefits (SSI) under Title II of the Social Security

Act.  This matter is before the court, United States Magistrate Judge Arthur J. Boylan, for a report and

recommendation to the district court on the parties' cross motions for summary judgment.  *See* 28

U.S.C. § 636 (b)(1) and Local Rule 72.1.  Based on the reasoning set forth below, this court

**recommends** that Jaeger's Motion for Summary Judgment [Docket No. 7] **be denied** and that the

Commissioner's Motion for Summary Judgment [Docket No.10] **be granted**.

**II.    PROCEDURAL HISTORY**

Jaeger applied for disability insurance benefits (DIB) and supplemental security income (SSI) on December 31, 2001.[1]  (T. 118 & 376.)  She claimed a disability onset date of July 28, 2001, due to osteoarthritis of the spine, an acoustic neuroma (removed), Bells Palsy Syndrome, loss of hearing in one ear, and legally blind in one eye.  (T. 137.)  Her claim was denied initially (T. 91) and on reconsideration (T. 93.)  Jaeger asked for and received a hearing before an administrative law judge (ALJ).  On January 11, 2002, ALJ Roger W. Thomas issued his decision denying Jaeger's applications for DIB and SSI.  (T. 37.)  The Appeals Council denied Jaeger's request for review.  (T. 9.)  Thus, the ALJ's decision became the final decision of the Commissioner and ripe for review.  *See* 42 U.S.C. § 405 (g).  Jaeger has appealed the agency's decision to this court.

**III.    FACTUAL BACKGROUND AND MEDICAL HISTORY**

Jaeger was born on March 15, 1951, and was 51 years old at the time of the hearing.  She graduated from high school and has attended one year of college.  She has worked in the past as a nurse assistant in a nursing home and a laborer in a factory.  (T. 162.)  She cooks several times a day.  (T. 173.)  She cleans house, reads, watches television for one hour, bathes, visits relatives, talks on the phone, and engages in exercise activities daily.  (*Id.*)  Weekly she shops, plays cards or games, and talks with neighbors.  (*Id.*)  She never drives or does yard work.  (*Id.*)  Her hobbies are walking and arranging artificial flowers.  (*Id.*)

She states that she cannot lift over five pounds or bend over without losing her balance.  (T.

---

[1]    This is Jaeger's second application for DIB benefits.  (T. 146.)  The earlier application was denied on March 2, 1999.  (*Id.*)

174.)  She has trouble hearing and seeing and has constant pain in her hands and back.  (*Id*.)  She

explains she has trouble concentrating and that it takes her much longer than usual to do most activities.

(*Id.*)

Jaeger's daughter, Kelly Jaeger, explained that her mom needs help with most activities due to

her poor vision and hearing and her difficulties with balance.  (T. 179.) Kelly explained that her mom

needs help with carrying items and needs someone with her at all times to help when needed.  (*Id*.)

### A.    *Treatment Notes From Jaeger's Treating Physicians*

On June 19, 2001, one month prior to her alleged onset date, Jaeger presented at the office of

Graham M. Oxnard, M.D., complaining of back pain that had been ongoing for nine months.  (T. 311.)

She described the pain as intermittent and moderately intense.  (*Id*.)  Dr. Oxnard noted that Jaeger had

suffered a back injury several years earlier that had been successfully treated with physical therapy.

(*Id*.)  He also noted that Jaeger "has a history of acoustic neuroma which leaves her with balance

problems."  (*Id*.)

On examination, Dr. Oxnard observed that she had "obvious Bells palsy on the left -hand side;"

her gait and station were normal; "she can toe walk and heel walk without difficulty with balance;" no

tenderness over the C-spine or L-spine; and "some tenderness over the T8 spinous process without

paraspinal muscle spasm or tenderness."  (T. 311-12.)  Dr. Oxnard noted that X-ray examination

revealed diffuse osteoarthritis throughout the spine, but no radicular symptoms.  (T. 312.)  Based on

these observations, Dr. Oxnard recommended " a conservative treatment using anti-inflammatories

periodically and Tylenol."  (*Id*.)  He also recommended physical therapy two times a week to

strengthen her back.  (*Id*.)

3

Jaeger visited Dr. Oxnard for a recheck on July 12, 2001.  (T. 312.)  Dr. Oxnard noted that Jaeger was doing well with physical therapy, but would need a number of further visits.  (*Id*.)  He also noted that she continued to have thoracic pain, which was well localized and worsened with movement.  (*Id*.)  Examination revealed no tenderness in the lumbar spine, but tenderness was noted over the T8 spinous process.  (*Id*.)  No paraspinal muscle spasm or discomfort was noted.  (*Id*.)  Dr. Oxnard gave her a sample of Celebrex[2] to determine its effectiveness in treating the symptoms caused by osteoarthritis in the thoracic spine and recommended that she continue physical therapy.  (*Id*.)

On August 23, 2001, Dr. Oxnard renewed Jaeger's prescription for Celebrex for six months.  (T. 313.)  He noted she had less pain and increasing activity due to attending physical therapy on a regular basis.  (*Id*.)  He also noted diffuse pain in the thoracic area, but no numbness, weakness, or paresthesias. (*Id*.)

The treatment notes indicate that Jaeger next visited Dr. Oxnard on January 17, 2002.  (T. 313.)  She presented with "evaluation of bilateral buttock pain as well as pain down into the thighs and calves bilaterally, right worse than left."  (*Id*.)  Jaeger described the pain as constant and accentuated by movement.  (*Id*.)  Dr. Oxnard concluded that the pain could represent a facet joint inflamation and noted a low probability of lumbar disc disease.  (*Id*.)  Vioxx was continued and a Medrol Dosepak was prescribed with a follow-up in two weeks.  (*Id*.)

On April 16, 2002, Jaeger was seen for a sore throat.  (T. 314.)  On May 31, 2002, Jaeger

---

[2]        Celebrex "is used to relieve pain, tenderness, swelling and stiffness caused by osteoarthritis (arthritis caused by a breakdown of the lining of the joints), rheumatoid arthritis (arthritis caused by swelling of the lining of the joints), and ankylosing spondylitis (arthritis that mainly affects the spine)." *MedlinePlus Drug Information* at http://www.nlm.nih.gov/medlineplus/druginformation.html.

underwent a complete physical examination.  (*Id*.)  Dr. Oxnard described Jaeger as under no distress,

normal gait and station, but elevated blood pressure of 174/88.  (T. 315.)  He prescribed one year's

worth of medication, including Vioxx, and instructed her to be seen on an as need basis.  (*Id*.)  On June

17, 2002, Dr. Oxnard noted a continuing elevated blood pressure and started a prescription of

hydrochlorothiazide,[3] with a follow-up in one month for a recheck.  (*Id*.)

Jaeger returned on August 12, 2002, for a recheck.  (T. 316.)  Dr. Oxnard noted that the medication

had lowered her blood pressure significantly to 180/84.  (*Id*.)  On September 10, 2002, Dr. Oxnard

referred to Jaeger's hypertension as "benign."  (*Id*.)

On October 14, 2002, Jaeger presented at the clinic for an evaluation for shoulder and back

pain.  (T. 317.)  The pain apparently started after a man grabbed her shoulder as he was falling to the

ground.  (*Id*.)  Dr. Oxnard noted pain in the shoulder and back with some radiation of pain up to the

neck, which had induced a headache.  (*Id*.)  Jaeger described the pain as daily, of moderate intensity

and worsening with activity.  (*Id*.)  The doctor noted "no numbness or pins and needles in the upper

limbs and there is no shooting pains down the arm."  (*Id*.)  Jaeger also reported pain in her right hip.

(*Id*.)  She reported the pain had been ongoing for four weeks and was worse when lying down or lying

on the leg.  (*Id*.)  On examination, Dr. Oxnard found tenderness to palpitation over the greater

trochanter on the right hip, but normal range of motion.  (*Id*.)  An injection of a combination of Depo-

Medrol, Marcaine, and lidocaine into "the right trochanteric bursa gave immediate relief of the

symptoms."  (T. 318.)  Dr. Oxnard suggested that Jaeger become involved in physical therapy if the

---

[3]     Hydrochlorothiazide is "used to treat high blood pressure and fluid retention caused by various conditions."  *Id*.

pain continued.  (*Id*.)

In October 2002, Jaeger presented at the Ear Specialty Center complaining of headaches.  (T. 270.)  Dr. Rick L. Nissen noted that Jaeger had been told that she had fluid in her left ear.  (*Id.*)  On examination, Dr. Nissen stated that there was no indication of infection of fluid in the ear canal that would account for Jaeger's headaches.  (*Id.*)  He states that he did not believe that her headaches were a result of the excision surgery of the acoustic neuroma perform in June 1997.  (*Id.*)  He noted that Jaeger was seeing a chiropractor who had indicated possible neck problems.  (*Id*.)  In November 2002, Jaeger returned for a follow-up sill complaining of headaches.  (T. 269.)  Dr. Nissen noted that Jaeger had recently suffered "trauma at work when a patient fell on top of her."  (*Id*.)  Dr. Nissen reiterated his belief that Jaeger's headache was related to her neck, not to the removal of the tumor.  (*Id*.)

Treatment notes indicate that a gold weight was implanted in her left eyelid to compensate for weakness caused by the removal of the acoustic neuroma.  (T. 295.)  Exposure keratitis was improved, but some burning was reported a month after implantation.  (*Id*.)  Ointment and artificial tears were prescribed to address the eye irritation.  (T. 294.)  She also had irritation caused by her lower lashes turning inward and rubbing against her eye (trichiasis).  This was treated by removing the irritating lashes.  (T. 295.)

### B.     *Treatment Notes from Jaeger's Physical Therapist*

Jaeger under went several physical therapy treatments from June 25, 2001 through October 18, 2001.  (*See* T. 246-66.)  On her initial visit she completed a lumbar spine evaluation.  (T. 246.)  The therapist noted that Jaeger's lumbar range of motion was restricted due to pain and a "pulling"

sensation.  (T. 247.)  Muscle strength was normal, with a rating of five out of five muscle strength, for the lower extremity muscles except for the hip abductor, which was a one out of five muscle strength. (*Id.*)  Reflexes were mostly normal.  (*Id.*)

On June 28, 2001, Jaeger complained of back pain due to a strained back from picking up her grandchild.  (T. 249.)  The therapist recommended additional treatments beyond the initial two week period that was prescribed by Dr. Oxnard.  (*Id.*)  On July 9, 2001, Jaeger complained of increased pain and stiffness due to a week of vacation and an accompanying long car ride.  (*Id.*)  The therapist recommended an increase to therapy three time per week.  (*Id.*)  On July 12, 2001, muscle tension was noted to be "not quite as intense."  (*Id.*)  On July 17, 2001, Jaeger stated that her back "was feeling much better."  (T. 250.)  She reported that she had taken only one pain pill during the prior week and that she had been able to lift her granddaughter several times during the week with no accompanying pain.  (*Id.*)  On July 19, 2001, Jaeger reported improvement with her overall symptoms, but on July 23, 2001, she reported increased pain which was attributed to gardening activities.  (*Id.*)  On July 24, 2001, she reported being " a little bit better," but having continuos right to left lower and mid-back pain.  (*Id.*)  On July 26, 2001, Jaeger reported an improvement noting that she had been able "to roll all the way around in bed, which she had not been able to do in probably over a year."  (*Id.*)  She did note some soreness in her legs due to pulling weeds for quite a long time.  (*Id.*)

Jaeger attended physical therapy nineteen more times between August 1, 2001, and October 18, 2001, approximately two times per week.  (*See* T. 251-56.)  She reported improvement with her pain at each visit, but also reported that pain was still present and that she experienced more pain when she aggravated her condition based on an increase in activity.  (*Id.*)      During this treatment period,

Jaeger completed a health history questionnaire.  (T. 261.)  She indicated on the health form that she

was able to do the following activities: Wash/comb her hair and brush her teeth; bathe/shower; put on

clothing, including undergarments and coat; prepare a meal; perform light housekeeping activities; and

drive a car.  (*Id*.)  She indicated that she was able to do the following but was limited and/or

experienced pain: reach into overhead cupboards; pick up things off the floor; lift and carry

groceries/laundry; sit for 30 minutes; stand for 30 minutes; climb a flight of stairs; walk two blocks;

perform all job duties; perform her favorite recreational/leisure activities; and sleep through the night.

(*Id*.)  She also indicated that her pain was a seven out of a ten or a moderate level of pain.  (*Id*.)

>C.     *Reports from Medical Evaluations*

On January 31, 2002, and affirmed on May 20, 2002, Dr. Jeffrey Gorman, completed a

physical residual capacity assessment.  (T. 226.)  In this assessment, based on a review of the medical

records, Dr. Gorman determined that Jaeger could occasionally lift 50 pounds, frequently lift 25

pounds, stand and or walk for about six hours in an eight-hour workday; sit for about six hours in an

eight-hour workday; and unlimited with respect to push and pull.  (T. 227.)  He did impose postural

limitation of climbing with ramps and stairs limited to occasionally, while never climbing a ladder, rope,

or scaffold.  (T. 228.)

On April 10, 2002, Jaeger underwent a psychological evaluation by Jill A. Peterson, a licensed

psychologist.  (T. 210.)  Peterson noted that Jaeger enjoys camping, fishing, babysitting her

grandchildren, renting movies, gardening, visiting her children, and gardening.  (T. 208.)  She also noted

Jaeger's daily schedule includes dusting, vacuuming, sweeping, and doing the dishes.  (*Id.*)  Jaeger

reported cooking a supper daily of meat and vegetables, shopping with her husband once a week, and

doing laundry, with help, two to three times a week.  (*Id*.)  Peterson diagnosed Jaeger with major depression.  (T. 209.)  Peterson summarized: "It appears that [Jaeger] is having some problems with depression.  However, her ability to be social and to have effective relationships is good.  She reports that her concentration problems are mostly because of pain.  Her depression does not appear to limit her to a serious degree."  (T.  209-10.)  She stated that Jaeger did not appear to have symptoms of a personality disorder.  Peterson also stated:

> [Jaeger] is able to understand, remember, concentrate on, and carry out simple instructions.  She will probably be able to understand, concentrate on, remember and carry through with some more complicated instructions.  Persistence and pace will not be a problem for her.  She will be able to get along with supervisors and co-workers.  Stress would probably cause a few problems, but she should be able to handle stress for the most part.  She reports that her anxiety and depression are there because of her health.  She should be able to work in competitive employment on an entry level.

(T. 210.)

On May 8, 2002, Dr. Thomas Kuhlman completed a psychiatric review technique form.  (T. 211.)  Dr. Kuhlman concluded that Jaeger's was suffering from a personality disorder which resulted in persistent disturbances of mood or affect, but that the impairment was not severe.  (T. 211 & 218.)

On June 15, 2002, Dr. Oxnard completed a Medical Assessment of Ability to do Work Related Activities (Physical).  (T. 234.)  He noted that lifting and carrying, standing and walking, sitting, stooping, couching, kneeling, and crawling were not affected by Jaeger's impairments.  (T. 234-35.)  He noted, however, that her visual impairment would cause her never to be able to climb and balance above four feet.  (T. 235.)  He noted that her visual limitations also included no bright lights, night driving or fine work requiring good visual acuity.  (T. 236-37.)

On February 3, 2003, Dr. Oxnard completed an additional medical opinion form about

Jaeger's ability to do work-related activities. (T. 239.) Dr. Oxnard noted Jaeger's osteoarthritis of the

thoracic spine resulted in a lowered range of motion and pain with activity involving the thoracic spine.

(*Id*.) Based on Jaeger's impairments, Dr. Oxnard opined that she would only be able to lift and carry

less than ten pounds on an occasional or frequent basis; stand and walk or sit for about two hours, with

a need to alternate between standing and siting; sit or stand for only 30 minutes before she would need

to change position; walk around every 60 minutes for five minutes; and be able to shift at will between

sitting or standing and walking. (T. 239.) He limited Jaeger to no reaching handling, fingering, or

feeling, but noted that she could perform pushing or pulling without restriction. (T. 241.) He stated that

she would be limited to never twisting, stooping, or climbing ladders. (T. 240.) She could occasionally

crouch and frequently climb stairs. (*Id.*)

Dr. Oxnard also noted Jaeger's left eye dysfunction involving recurrent corneal ulcers and

photosensitivity. (T. 240.) He explained that this was caused by the removal of a acoustic neuroma

five years earlier leaving her problems with her left eye lid. (*Id*.) He stated that her eye dysfunction

would preclude her exposure to bright light and night driving. (*Id*.) He also restricted her from heights,

fumes, odors, dusts, gases, and poor ventilation. (T. 241.) He anticipated that Jaeger's impairments

would cause her to be absent from work for more than three times a month. (*Id*.)

On February 27, 2003, Dr. Gerald A. Roust sent a letter to Jaeger providing information about

the function of Jaeger's right eye. (T. 374.) Dr. Roust explained that the removal of the acoustic

neuroma caused damage to the facial nerve on the left side of Jaeger's face. (*Id*.) This resulted in a

poor ability to blink which in turns lead to problems associated with a dry eye. (*Id*.) The doctor further

explained that a gold weight was implanted in Jaeger's eye lid to facilitate blinking. (*Id*.) According to

Dr. Roust, Jaeger continues to experience irritation in her left eye which causes decreased vision and decreased ability to judge distances.  (*Id*.)

## IV.   TESTIMONY AT THE ADMINISTRATIVE HEARING

An administrative hearing was held on March 17, 2003 with ALJ Roger W. Thomas presiding. (T. 57.)  The claimant appeared and was represented by counsel.  (*Id*.)  The claimant, the claimant's husband, Steven Jaeger, and Frank D. Samlaska, a vocational expert (VE), testified at the hearing. (*Id.*)

Jaeger testified abut her problems related to her difficulties with vision, explaining that she was legally blind in her left eye.  (T. 64.)  She also described the related problems of her left eye tearing, hurting, and burning.  (*Id*.)  She explained that she uses an ointment to help relieve the symptoms, but that it makes her vision blurry.  (T. 64-65.)  She stated that the pain is a distraction when she tries to do things around the house.  (T. 65.)  She explained that she sometimes wears a patch to protect her eye from irritants.  (T. 70.)  She stated that she agreed with the doctor's assessment that she would be unable to do fine work because she would not be able to see well enough to do the work.  (T. 69.)

Jaeger talked about the pain in her hips, lower back, and neck.   (T. 66.)  She explained that she received a cortisone shot in September 2002 when her hip pain became severe.  (T. 67-68.)  She also received a shot in March 2003, shortly before the hearing.  (T. 68.)  She stated that the last shot had not been helpful and that she was supposed to go back to the doctor, but with her husband losing his job and the accompanying health insurance, she had been unable to visit the doctor.  (*Id.*)  She explained that she had been having pain in her neck, but that she was unable to recall if the pain in her neck had been diagnosed.  (*Id*.)  She noted that going to a chiropractor had been helpful for a long

11

term basis.  (*Id*.)  She explained that she had gotten a permanent handicap sticker for her car because of the pain in her hip and back.  (T. 70.)

Jaeger testified that in 2001 she was able to lift her grandchild who weighed approximately 18 pounds, but that at the time of the hearing she was only able to lift five pounds.  (T. 71.)  She explained that this was due to her problems with her hip, back, and neck.  (T. 72.)  She said that if she lifts ten pounds, as was indicated by her doctor's latest RFC, she would hurt.  (*Id*.)  She said that she during a normal day, she sits for about two hours and can stand for about two hours, but needs to alternate in 30-minute intervals.  (*Id*.)  When asked by the ALJ what she does with the remaining time of the day, Jaeger stated that she does chores, but that she has to be careful and that it takes her a long time to complete.  (*Id.*)

On questioning by her attorney, Jaeger explained that she has problems with her hands.  (T. 73.)  She stated that "[t]hey hardly bend, and they're hard to pick up things and they hurt."  (*Id*.)  She stated that Dr. Oxnard had been her treating doctor sine 1997 and that he had prescribed Vioxx for her arthritis.  (*Id*.)  She said that the medication did not take away the pain.  She also said that she had been having constant headaches that she associated with fluid in her left ear.  (T. 74.)  She said that Tylenol lessens the pain, but does not eliminate it.  (*Id*.)  She stated that she had problems walking and that she could stand for no more than 10 minutes.  (*Id*.)           Jaeger explained that she suffered from Bell's palsy as a result of brain surgery that removed a non-malignant tumor from her left auditory nerve.  (*Id*.)  She also explained that since the surgery she has had difficulty in maintaining her concentration when talking with people or answering questions.  (*Id*.)  She stated that she had not driven a car in two years.  (*Id*.)

Next, Jaeger's husband, Steve Jaeger, testified at the hearing.  (T. 75.)  Steve explained that he had just been laid off from his job, but was currently looking for another place to work.  (*Id*.)  He stated that for the past two years, his wife had been unable to care for her own needs when he had been at work.  (*Id*.)  He explained that their daughter would come over and help Jaeger.  (*Id*.)  He reported that Jaeger needed help getting up from sitting in a chair and help getting out of the bathtub.  (*Id*.)  He explained that it was easier for Jaeger to bathe at their daughter's house because her bathroom has a shower where Jaeger can stand up.  (T. 77.)  He stated that she does the majority of the coking for the two and that she is able to feed and dress herself.  (*Id*.)  She does not lift any laundry baskets of grocery store bags.  (*Id*.)  He stated that she can walk ten to fifteen minutes at the most at one time before she needs to sit down.  (*Id*.)

Steve testified that Jaeger's pain seemed to be the same when she was standing or siting and that she takes Tylenol for the pain.  (T. 78.)  He said that she does not use a crutch or cane.  (*Id*.)  He explained that she has possibly driven once in the past couple of years, but that he usually drives her and drops her off at their daughter's house on his way to work.  (*Id*.)  He explained that she is not able to help with her grandchildren and that she has problems with her hands related to arthritis.  (T. 79.)  He explained that the record did not indicate a diagnosis of arthritis because the doctor has told them that her knuckles were not swollen enough.  (*Id*.)

Finally, Frank Samlaske testified as the vocational expert.  (T. 80.)  The ALJ listed Jaeger's symptoms and posed a hypothetical to the VE based on the following limitations: a sit/stand option with no fine visual requirement; no night driving; and semiskilled to unskilled level of work.  (T. 84-85.)  The VE testified, that based on these limitations, Jaeger would not be able to perform her past relevant

work and that she did not have any transferable skills. (T. 86.) Recognizing the ALJ's limitations as a modified light level of work, the VE stated that Jaeger would be able to perform jobs such as a motel desk clerk, which has approximately 2,700 jobs. In addition, the VE testified that Jaeger would be able to be a gate guard or a bench/parts assembler. (*Id.*) The ALJ then added the limitation of no exposure to any particulate matter such as dust. (*Id*.) The VE testified that this additional limitation would preclude the assembler and gate guard positions, because of exposure to dust. (T. 87.) The ALJ then added a third restriction of the sit/stand option limited to 30 minutes. (Id.) The VE testified that this would eliminate the hotel desk job, as would a limitation of lifting less than ten pounds, resulting in no jobs within the national economy.

The VE also testified that, based on the treating physician's work-ability evaluation, Jaeger would be limited to sedentary work activity. (T. 88.) Taking onto account a sedentary level of work activity, Jaeger's age of over 50 years old, and her lack of transferable skills, the VE testified that, under this limitation, Jaeger would be disabled under the guidelines. (*Id.*) In addition, when asked the implication of the physician's opinion that Jaeger would miss more than three time a month because of her multiple impairments, the VE replied that this kind of limitation would preclude employment. (*Id*.)

## V.   THE ALJ'S FINDINGS AND DECISION

On August 27, 2004, ALJ Thomas issued an unfavorable decision denying Jaeger both DIB and SSI. (T. 32.) The ALJ first determined that on the alleged onset date of July 28, 2001, Jaeger met the nondisability requirements set forth in the Social Security Act and was insured through December 31, 2002. In reviewing Jaeger's claim, the ALJ then followed the sequential five-step procedure as set out in the rules. *See* 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a). The Eighth Circuit has

14

summarized these steps as follows:

> The Commissioner must determine: (1) whether the claimant is presently engaged in "substantial gainful activity;" (2) whether the claimant has a severe impairment--one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity [RFC][4] to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*Fines v. Apfel*, 149 F.3d 893, 894 - 95 (8th Cir. 1998) (footnote added).

The ALJ determined that Jaeger had not engaged in substantial gainful activity.  He also determined that she had multiple severe impairments: "a history of acoustic neuroma with surgical excision in 1997, resulting in diminished vision in the left eye, diminished hearing in the left ear and pressure headaches; osteoarthritis of the thoracic spine; mild C6-7 disc herniation; hypertension; and low back, right hip, and left shoulder strain with pain."  (T. 36.)    The ALJ concluded, however, that these impairments, though severe, did not met or equal a listed impairment in Appendix 1, Subpart P, Regulation No. 4, which would indicate a presumption of disability.  (*Id*.)

The ALJ next determined Jaeger's RFC.  (T. 32.)  The ALJ found that Jaeger's assertion that she is disabled from all work activity was inconsistent with her activities of daily living and the objective medical records.  In addition, the ALJ discounted Dr. Oxnard's opinion regarding Jaeger's limitations because of the inconsistencies with the limitations expressed in his February 2003 report and those

---

[4]    A claimant's RFC is the most the claimant can still do despite the claimant's physical and/or mental limitations.  20 C.F.R. § 404.1545.

noted in treatment notes and the work ability report completed in June 2002. (T. 33.)  The ALJ

concluded that Jaeger "retains the residual functional capacity for light work requiring lifting and carrying

20 pounds occasionally and 10 pounds frequently, sitting two hours and standing and or walking six

hours in an eight-hour work day, with no fine visual requirements, binocular vision or night driving and is

unskilled to semi-skilled." (*Id*.)  Based on this RFC, the ALJ found that Jaeger was unable to perform

her past relevant work as a nurse's aid or machine packer/laborer. (*Id*.)  Noting her age, educational

background, and past relevant work, and taking into consideration as Jaeger's RFC, and considering

the testimony of the VE, the ALJ determine that there are a significant number of jobs within the

national economy that Jaeger could perform. (*Id*.)  These jobs included motel desk clerk, bench and

parts assembler, and gate guard. (*Id*.)  Accordingly, the ALJ concluded that Jaeger was not disabled

as defined by the Social Security Act. (*Id*.)

## VI.   DISCUSSION

### A.    *Standard of Review*

This court will affirm the ALJ's findings that the claimant was not under a disability if the findings

are supported by substantial evidence based on a review of the entire record. *Haley v . Massanari*,

258 F.3d 742, 747 (8th Cir. 2001).  "Substantial evidence is less than a preponderance, but enough

that a reasonable mind might accept it as adequate to support the decision." *Id.* (quoting *Beckley v.*

*Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998)).  The review the court undertakes, however, must go

beyond solely the examination of the record for evidence in support of the Commissioner's decision.

*Id.*  The court must additionally examine the record for evidence that detracts from that decision. *Id.*

Nevertheless, as long as there is substantial evidence to support the decision, this court will not reverse

it simply because substantial evidence exists in the record that would support a contrary outcome or

because this court might have decided differently.  *See id.*; *see also Stormo v. Barnhart,* 377 F.3d

801, 805 (8th Cir. 2004) ("If substantial evidence supports the outcome, we will not reverse the

decision even if substantial evidence also supports a different outcome.").

### B.      *Analysis of Decision*

"The Social Security program provides benefits to people who are aged, blind, or who suffer

from a physical or mental disability."  42 U.S.C. § 1382(a); *Locher v. Sullivan*, 968 F.2d 725, 727

(8th Cir. 1992).  Disability under Social Security regulations means that the claimant is unable to work

by reason of a "medically determined" physical or mental impairment or impairments and that the

impairment, or combination of impairments, must be so severe that the plaintiff is not able to perform

any kind of substantial gainful work.  42 U.S.C. § 1382c(a)(3)(A).  This impairment must have lasted

or be expected to last at least twelve months or be expected to result in death.  *Id.*

The Eighth Circuit has long emphasized that social security benefits hearings are non-adversarial

proceedings.  *See Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004).  The ALJ must "develop

the record fairly and fully, independent of the claimant's burden to press his case."  *Id.*  "The ALJ

possesses no interest in denying benefits and must act neutrally in developing the record."  *Id.*  The goal

of the administrative process is that "deserving claimants who apply for benefits receive justice."

*Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir.1994).  In disability determinations, however, the claimant

bears the burden of proving her residual functional capacity.  *Goff v. Barnhart,* 421 F.3d 785, 790

(8th Cir. 2005).

Jaeger asserts that (1) the ALJ failed to give great weight to treating physician's opinion; (2) the

17

ALJ's decision is not supported by substantial evidence; (3) the ALJ committed reversible error by failing to give the appropriate weight to Jaeger's subjective complaints; (4) the ALJ relied upon an improper vocational questioning based on a hypothetical question that did not relate with precision all of Jaeger's impairments; and (5) the ALJ should have applied a later onset date and found Jaeger disabled based on the grids in the regulations.

Jaeger's assertions essentially boil down to two separate issues: whether the ALJ properly discounted the treating physician's opinion with respect to Jaeger's physical impairments and whether the ALJ properly determination that Jaeger's subjective complaints were not fully credible.

### a.    The ALJ's Use of Dr. Oxnard's Evaluations in Determining Jaeger's RFC

Jaeger argues that the ALJ erred by failing to grant controlling or great weight to Dr. Oxnard's February 3, 2003 evaluation.  (Pl. Mem. at 7.)  In this evaluation, Dr. Oxnard opined that Jaeger is able to lift and carry less than ten pounds on an occasional or frequent basis; stand and walk or sit for about two hours, needing to alternate between standing and siting; sit or stand for only 30 minutes before she needs to change position; walk around every 60 minutes for five minutes; and must be able to shift at will between sitting or standing and walking.   He also indicated that  Jaeger's impairments would cause her to be absent from work more than three times a month.  The ALJ, on the other hand, concluded that Jaeger can lift and carry 20 pounds occasionally and 10 pounds frequently, sit two hours and stand and/or walking six hours in an eight-hour work day.  The ALJ did not include any limitation on Jaeger's ability to be presence at work.

Generally, "[a] treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight."  *Cunningham v. Apfel*, 222 F.3d 496, 502 (8th Cir. 2000).  "In fact, it should

be granted controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Id*. However, "[a] treating physician's opinion does not automatically control, since the record must be evaluated as a whole." *Bentley v. Shalala*, 52 F.3d 784, 786 (8th Cir.1995). If the physician has offered inconsistent opinions or other medical opinions are offered that are supported by superior medical evidence, then the ALJ may discount the treating physician's opinion. *Holmstrom v. Massanari*, 270 F.3d 715, 720 (8th Cir. 2001). Under agency regulations, the ALJ must always provide good reasons why the treating physician's opinion was discounted. *See* 20 C.F.R. § 404.1527(d)(2).

Here, the ALJ explained that he was discounting Dr. Oxnard's opinions in the February 3, 2003 evaluation because, *inter alia*, the opinions were inconsistent with Dr. Oxnard's opinions expressed just eight months earlier in another evaluation and inconsistent with the objective medical evidence. (T. 33.) The ALJ notes that Dr. Oxnard saw Jaeger on only one occasion during the interval between the two evaluations when he treated her for a left shoulder strain and pain due to right trochanteric bursitis.[5] The ALJ notes that Dr. Oxnard based the more restrictive limitations on Jaeger's thoracic osteoarthritis; "a condition that clearly was present at the time of the [earlier evaluation]." (*Id*.) The ALJ notes that there had been no further diagnostic studies or physical evaluations of Jaeger's spine during the intervening period nor had there been any new treatment prescribed. (*Id*.)

---

[5]     Trochanteric bursitis is the inflammation of the bursa located on the outside of the hip joint. *See MedlinePlus Medical Encyclopedia* at http://www.nlm.nih.gov/medlineplus/encyclopedia.html.

The ALJ explained that Dr. Oxnard's initial evaluation completed on June 15, 2002, was also inconsistent with the objective medical evidence and with Jaeger's self-reported complaints of pain. Accordingly, the ALJ determined that the June 15, 2002 evaluation did not correctly identify Jaeger's limitations. The ALJ explained that he believed that Jaeger's limitations were more restrictive than the limitations Dr. Oxnard had imposed in June 2002. (*Id.*) The ALJ explained that due to the inconsistencies between Dr. Oxnard's two evaluations, with no explanation as to the increase in limitations stated in the second evaluation, and inconsistences between Dr. Oxnard's opinions and other evidence in the record, the ALJ declined to give significant weight to either of Dr. Oxnard's evaluations.

Jaeger suggests that Dr. Oxnard's opinions are not inconsistent but merely reflect Jaeger's condition worsening over time. There is, however, no evidence in the record to support this position. There are no treatment notes indicating a worsening condition. There are no increased visits to the doctors office. There is only one visit to see Dr. Oxnard between the two evaluations and that visit was based on bursitis and shoulder strain. There is no indication in a change of treatment during that time frame. Dr. Oxnard has failed to supple the record with an explanation to the inconsistencies between the two reports, spaced within such a relatively short time span. The ALJ determined that Jaeger's RFC fell somewhere between Dr. Oxnard's two reports, limiting Jaeger to modified light work. The court finds that the ALJ gave good reasons why he discounted Dr. Oxnard's reports. Thus, the ALJ properly discounted Dr. Oxnard's severe restrictions based the inconsistency of his opinions and the lack of any explanation of the inconsistent limitations. *See Zenker v. Bowen*, 872 F.2d 268 (8th Cir. 1989).

**b.      *The ALJ's Determination that Jaeger's Subjective Complaints were not Fully Credible***

Jaeger also asserts that the ALJ improperly discounted Jaeger's subjective complaints.  (Pl. Mem. at 11.)  According to the Eight Circuit, the ALJ must consider several factors when evaluating a claimant's subjective complaints.  *See Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984).  "[T]he ALJ must consider, in addition to objective medical evidence, any evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions."  *Pearsall v. Massanari*,  274 F.3d 1211, 1218 (8th Cir. 2001) (citing the *Polaski* decision).  Jaeger argues that the ALJ "gave absolutely no explanation, as required by *Polaski*, as to why he discredits [Jaeger's] testimony as to her pain." (Pl. Mem. at 12.)

In his decision, the ALJ notes that a claimant's subjective complaints must be evaluated in conformance with the requirements of *Polaski.*  (*See* T. 32.)  The ALJ then specifically notes that Jaeger's subjective complaints, as indicated by her testimony at the hearing, varied significantly from the objective medical evidence; statements made by the psychologist; earlier statements from Jaeger to the psychologist; and Jaeger's self-reported activities of daily living.  (T. 34.)  The ALJ also explained that the conservative treatment prescribed by Jaeger's doctors did not indicate a level of severity as claimed by Jaeger.  (*Id*.)

Although the Eighth Circuit requires the ALJ to consider the factors delineated in *Polaski*, it does not require the ALJ to discuss each factor.  *See Strongson v. Barnhart*, 361 F.3d 1066, 1072

(8th Cir. 2004).  As long as the ALJ indicates he is aware of the factors to be considered and provides

sufficient explanation as to why the claimant's subjective complaints were discredited, the Eighth Circuit

has held that the requirements under *Polaski* are satisfied.  *Id.*  ("The ALJ need not explicitly discuss

each *Polaski* factor. It is sufficient if he acknowledges and considers those factors before discounting a

claimant's subjective complaints.") (citation omitted).  Here, the ALJ noted the *Polaski* factors and

discussed several reasons why he found Jaeger's complaint of complete disability not fully credible.  He

acknowledged that he did take into account some of Jaeger's subjective complaints, as well as the

limitations described by Jaeger's husband and daughter. (*See* T. 34.)  He concluded, however, that

Jaeger's subjective complaints were not fully credible and that total disability, as alleged by Jaeger, is

not consistent with the evidence presented.  The court finds that the ALJ's analysis fell within the

parameters described by the Eighth Circuit.  Accordingly, the court concludes that the ALJ did not

error in finding that Jaeger's subjective complaints were not fully credible.

## VIII.   CONCLUSION AND RECOMMENDATION

Jaeger argues that the ALJ should have found that Jaeger was limited to sedentary work, and

that based on her age, education, and past work experience, she would have been disabled under the

regulations guidelines.  Jaeger also argues that the question posed to the VE did not include all of

Jaeger's limitations and thus did not constitute substantial evidence.  Finally, Jaeger argues that the ALJ

should have found her disabled at a later onset date.  This court, however, has concluded that the ALJ

did not error in discounting Dr. Oxnard's opinions regarding Jaeger's limitations or in discrediting

Jaeger's subjective complaints.  A thorough review of the record indicates that the ALJ's determination

of Jaeger's RFC and subsequent question posed to the VE are based on substantial evidence in the

record.  Therefore, the ALJ properly relied on the testimony of the VE which indicated that there were

a significant number of jobs within the regional economy for which Jaeger had the ability to perform.

Accordingly, the court **HEREBY RECOMMENDS** that the ALJ's determination be affirmed and

that Jaeger's Motion for Summary Judgment [Docket No. 7]  **be denied** and the Commissioner's

Motion for Summary Judgment [Docket No. 10] **be granted** .

Dated:  June 6, 2006


s/ Arthur J. Boylan
Arthur J. Boylan
United States Magistrate Judge


**NOTICE**

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before **June 23, 2006.**